Dr. 2-17-0218 Mason M. Smith, plaintiff's appellant Mr. Daniel J. Schleicher, MD, St. Lucian American Hospital, defendants' athletes Arguably on behalf of the plaintiff's appellants, Mr. Thomas G. Siracusa Arguably on behalf of the defendants' athletes, Ms. Melinda S. Paulos Also arguably on behalf of the defendants' athletes, Mr. Michael J. Orsi Mr. Siracusa Thank you, Mr. Coon, counsel. Good morning. Good morning. Defendants characterize this case as involving a classic battle of the experts. If true, that substantiates the harm that was caused by the admission of irrelevant and highly prejudicial evidence on cross-examination of the plaintiff's only standard of care expert. The plaintiff in this case was forced to try two cases. Number one, to prosecute a medical negligence case against the defendant. And secondly, to defend the plaintiff's standard of care expert both in terms of his credibility and his prior remote conduct which bore no relationship to the facts in this case at all. And make no mistake, not only... When you bring an expert, don't you always put his or her prior professional history out to be cross-examined? Isn't it probative? No, Your Honor, not if it's absolutely irrelevant to the facts at hand. And the excuse for admitting this evidence or seeking the admission of this evidence was that it showed bias, and it showed no bias because Dr. Dine's prior occurrence was much too dissimilar to the facts in this case. And it did not in any way undermine his testimony about the negligence that occurred herein. Weren't there two theories of liability? There were. There was the theory for causing the six holes in the bottle and a second theory for the delay in diagnosis. How are the two incidents similar insofar as recognizing, diagnosing... recognizing an injury, diagnosing an injury, and treating the injury as between your expert and Dr. Schleicher? They were not at all similar. This case involved six holes, six perforations in the plaintiff's bottle. Done under direct visualization with a camera. It was Dr. Dine's theory that the defendant was negligent in entering the bottle six times, three times, full width, excuse me, three times full width of the bottle while using a camera, and he explained his opinion because the operative report indicated that in the area where the injuries occurred there was an overlying of the omentum. So Dr. Dine's theory was that the defendant, while having the ability to visualize the area, should not have gone in through the omentum and caused three perforations through the full width of the bottle. Excuse me. You said three perforations. What was a perforation? It's confusing. There were six holes. But three perforations? There were three perforations going through the full width, so three holes that were full width. You never have captains with perforated caps, do you? No. Because each hole is a perforation. I understand. So there were six holes. Thank you for that clarification. Yeah. It's a telepoise. Dr. Dine's occurrence, which occurred in 1989, involved him in an emergency attempt to drain an abscess without the presence of a camera, doing a blind insertion and entering the patient's bowel, a bowel which was, in Dr. Dine's words, grossly distorted, and immediately recognizing that he was in the bowel and doing the repair. So the idea that the use of a camera can then be equated with a blind insertion, there's no similarity. The idea that six holes in a planned elective procedure done with an assistant under controlled circumstances compared to an emergency procedure with one hole that's recognized immediately doesn't allow similarity. And so there was absolutely no similarity between Dr. Dine's event 28 or so years prior to this case. The only reason personal practice testimony is allowed is for impeachment of an expert's opinion. And Dr. Dine admitted that injuries can occur, including injuries to the bowel, can occur during procedures like this in the absence of negligence. But he limited his criticism specifically to the facts of this case where you had direct visualization and you went through the full width of the bowel, 3 1⁄2 centimeters, three separate times causing six holes. There was no impeachment value to the fact that he injured a bowel with a trocar under emergent circumstances 28 years ago. And there was no bias. And Your Honor asked the question about isn't the expert's history relevant? It can be relevant to show bias. But what bias did defendants show by introducing evidence of such a dissimilar occurrence? It didn't undermine his opinion in any way in this case. It didn't show his bias. Yet they were allowed, after the introduction of this evidence, they were allowed to get up and argue to the jury that, well, Dr. Dine criticizes us in this case, but when he does the same thing, he's complying with the standard of care. And again, that was plaintiff's only standard of care testimony in the case. And so for that reason, I think Your Honors, in reviewing the record, will have to conclude that this affected the outcome of the trial. And I alluded earlier to the fact that this became really a basis for the whole defense, and it did because the defendants presented cumulative testimony of standard of care experts that the reason this injury occurred was because the plaintiff had this inherent compressed bowel at or near her umbilicus, which is the reason why the defendant, even with the use of the camera, could not see that he was entering the bowel. Well, that theory was not supported in the medical records, nor was it supported in the defense on testimony. There was some reference to it in one of the medical records, wasn't there? Is that a possibility? There was a reference to a possibility, but Your Honor, what's important is the defendant, when he realized about four days after the procedure that this woman's abdomen was infected, he said that he contemplated how this could have occurred, and he thought about it a great deal. And he was there at the second procedure when the abdomen was opened up. Now, think about it. Common sense. This doctor was wondering, how did this happen? How are these injuries there? What's going on? And he opens up the abdomen, and he doesn't say, oh, there's the reason this occurred. There's this compressed, inherent, distorted anatomy.  His assistant, the actual surgeon for the second procedure to repair the bowel, made no mention other than a potential of there being adhesions, and adhesions occur very regularly. The defendants came up with a specific theory that coincidentally mirrored what had happened to Dr. Dine in 1989, because Dr. Dine said the reason his injury occurred was because there was this bowel inherent to the abdomen. Well, when you say he came up with that, did this happen through the use of a medium, or was it serendipitous, or was it based upon a statement that was made after the deposition of your expert? Well, the event in 1989 came out in Dr. Dine's discovery deposition, and the defendants' opinions, witness opinions were disclosed thereafter. So I don't think it's a stretch for anyone to conclude that the fact that they came up with this theory... Well, was there an opportunity to disclose this theory before? I'm sorry, your Honor. The process... The fact that the opinion was given to you after doesn't necessarily mean that it was recently fabricated. So I was asking whether or not there was an earlier opportunity, either in medical records or elsewhere, where the defendant could have theorized consistently with your expert's experience. The medical record... The only medical record evidence of any issue was the potential for adhesions that was noted in the report of the procedure. At the defendant's deposition, he did not raise this issue of any adherent or compressed bowel. He simply did not know, he testified, why or how this occurred. He also was unclear when during the procedure this occurred, and it was the defense experts who came in and testified that it occurred during the initial insertion. Again, something that Dr. Dine did not agree with. Dr. Dine testified that it occurred in the left lower quadrant port, not at the time of the initial insertion. So the defense theory mirrored what had occurred with Dr. Dine in 1989. And that was played up, and as I stated, that was used to undermine the credibility of plaintiff's only standard of care experts. Let me ask you a question about the patrol cars. The initial insertion is through the one in the center, right? Yes. And then there's a camera that's inserted. Yes. To be able to visualize the entry in the left and the right. Is that correct? Correct. The left and the right themselves, do they have a camera with them, or is it just observed from the center? At the time of the left side insertion, there was a camera placed so the abdomen can be viewed, as Your Honor pointed out. From the center. From the center. So when we say it's done under the visualization, it's because now it's on the screen, and you can see where the patrol car is moving. But there is a camera that was used at the time of the initial insertion in this case as well. And then the stylus is changed and the camera placed in there, so throughout the procedure through these three ports, everything that's done is being done under visualization. The entry of the left patrol car, that is only visualized from the center camera, is that right? Correct. Okay. So there's no visualization for it itself as it's entered, inserted. My recollection is as that stylus or as that patrol car was being inserted, it was being viewed on the camera that had been placed in the umbilicus port. So the anatomy is being viewed, and that actually gives a better view of the anatomy because if you can imagine if the camera is just on the end of the stylus, you just see where you're going in. It's somewhat one-dimensional. Now you have a three-dimensional view of the entire intra-abdominal area. So you could presumably see, if the camera is correctly placed, you could presumably see some depth. So as they're inserting, though, the left patrol car, they are watching it on the cameras from the center patrol car? Is that what you call it? Correct. Okay. I believe there were two monitors placed at the patient's feet to allow the observation of the entry. So as I stated, this evidence was dissimilar. It was non-impeaching. And because of the fact that the court allowed this to happen. If there is a point by implication, they weren't dissimilar, but even if they were similar, it wasn't impeaching. Correct. The only similarity was that a bowel injury occurred with the patrol car. That's the only similarity between these two things. You mean it wasn't done in the same patient? I'm sorry? Well, it wasn't done in the same patient. And it was 28 years apart without a camera. But regardless of the similarity, as Your Honor points out, this was not impeaching because. . . No, I didn't point it out. I said you implied it when in either the same statement or two statements, one right after the other, that even though it was dissimilar, it still wasn't impeaching. It was not for the reason that Dr. Dine freely admitted that injuries can occur to adjacent organs and tissue under circumstances that do not involve negligence. Had Dr. Dine come into court and said, anytime a bowel is injured during a laparoscopic procedure, I believe the doctor is negligent. Then it would have been potentially appropriate for the defendants to bring in evidence of a situation where he felt he was not negligent when he injured a bowel. Does it go to his familiarity with the procedure? Certainly the fact that he had done an abdominal laparoscopic procedure with a troll car. Dr. Dine actually was the person. . . He practices in Philadelphia. He was the person who had done the first types of these procedures in that entire region. He had been doing them longer than most. Are you saying he's the pioneer of laparoscopic? No. Dr. Dine testified that in his region, he was doing the initial, yes, laparoscopic gynecologic procedures in his region. Oh, in his region? In his region. Whatever that region is, the Philadelphia area. That was part of the record. Let's assume that it was error to extend the scope of the crosshair. Why is it reversible error? The court has to look at whether this evidence, based on the entire record, affected the outcome of the trial. And I believe when you consider that Plaintiff's only standard of care expert was allowed to be portrayed as duplicitous and self-serving and really dishonest. Inconsistent. Inconsistent. Contradictory, paradoxical, conspiratorial. All of the above. I don't know how the conclusion can be anything other than this affected the outcome of the trial. It's kind of like the Bulger v. CTA case where evidence of a driver's prior violation of a CTA rule was allowed in. And the court found, on appeal, the court found that that was harmful error because his prior conduct had nothing to do with his occurrence on the day of the question. It's a little different. But this is very analogous in the sense that this prior occurrence in 1989 was used to wipe out his opinion that this event that involved an entirely different set of circumstances could be criticized by the doctor credibly. And not only was the 1989 event brought up, but over objection there were questions asked about other troll car injuries that he may have experienced. There was a failed impeachment during the course of his cross-examination by an answer that he gave in his deposition that was not impeaching. So there was not only a focus on this one remote dissimilar event, but it was then broadened to include other injuries that Dr. Dine had caused. And I don't think the court will find another case where a doctor's injury-causing events were allowed. Certainly the defendants didn't cite any such cases. I would compare this to cases of personal practice where it is very rare to allow evidence of a physician, even an expert's personal practice, certainly not a defendant's personal practice, other than when it directly impeaches what the witness is saying. So we have cases where a doctor will come in and say the standard of care for the treatment of this condition required X, but I always do Y. Those are the extreme examples where evidence like this has been allowed. And again, this occurrence, this prior occurrence, does not meet that standard. So I believe a complete review of the record will indicate that this extremely prejudicial cross-examination affected the outcome of the trial based on the fact that Dr. Dine's credibility was undermined with evidence that should not have been allowed. Thank you for your time. Thank you. Is it Kolaros or Kolaros? Kolaros. Is that Scottish by any chance? You know what? No, it's not. It's German. But if I get points for Scottish, yes. May it please the court, counsel. I just want to correct a factual misstatement before I launch into the full argument. Dr. Miller's operative report from the December 17th surgery noted that he had to break up adhesions before he could run the length of the bowel to look for any perforations. That's at record pages 805, 806. So the representation made that there were no adhesions found and that there was no evidence in the medical record to support the expert testimony for the defense of an adhesed, compressed bowel. That is inaccurate. I also do want to note right at the end, counsel brought up this evidence about five other trocar injuries. The only objection that was made to that was asked and answered, and then another question was asked about those other trocar injuries. No objection was made. So I don't want the court to be misdirected into looking beyond this issue with Dr. Dine. You have to find an abuse of discretion here in order to even go and determine whether we have prejudice.  Judge Prochaska very carefully reviewed this issue not once, not twice, three times, on the opening motion in Limine, on a motion for reconsideration, and at the end, post-verdict on a post-trial motion. The court ruled that this evidence from Dr. Dine was admissible not only to show a test of his credibility, bias, interest, and the like, which we've talked about this morning, but also as affirmative evidence of non-negligence by Dr. Schleicher. Now, how could that be? Well, Dr. Schleicher, and I'm going to talk about the similarities and differences in the procedures in just a moment because it's critically important, but Dr. Dine said that he acted within the standard of care in perforating the bowel of his patient because that bowel was adhesed. It was physically stuck to the patient's abdominal wall, and therefore, when he inserted the trocar, it went into that bowel, and that that condition was unknowable prior to his entry. That is exactly what the defense maintains happened in this case, that the plaintiff, who had had a number of previous abdominal surgeries, had adhesions. There was a risk of adhesions. That's the entire reason the OptiView was being used in the first place, but the condition is unknowable. Remember, the OptiView is coming like this into the abdomen. There's a camera up here. We can't see what's under here. Here's where the adhesions are stuck up to the abdominal wall. Different than counsel. Wouldn't the doctor be able to determine what he's going through based on his feel? I mean, after all, this is an experienced surgeon. He should know the difference when he's hitting skin, when he's hitting the lower level, and when he's starting to hit adhesions, correct? He testified no, that it feels very much the same. The jurors actually asked that question. What is the difference between the way the bowel feels and the other structures? And Dr. Schleicher testified they feel very much the same. And the reason, really the key in this entire case is how much compressed bowel was there. The defense experts testified that trocar went through in one move. When it perforated, when it went through the peritoneum into the abdominal cavity, it went right through that bowel because it was compressed and stuck up there. And that he didn't know he was in the bowel because he was already past it.  So everything looks okay, not only to him, but to Dr. Moore, his assistant, who was watching these monitors to see what is going on as they perform the surgery. And then afterwards, they're looking for any injuries after they've completed the vaginal portion. They're looking again. Why don't they see any contents leaking into the abdomen? Under the plaintiff's theory, the left trocar has caused the injury. There would have been bowel contents leaking into the abdomen, if not when the trocar was inserted, certainly when it was removed. Remember, we've got that center camera. The left trocar comes in. Both Dr. Schleicher and Dr. Moore are watching the monitors. We've now got the camera in the abdominal cavity. They don't see any injury caused by this left trocar. When the surgery is completed, that left trocar is pulled back out. You would think if there was a perforation caused by that trocar, you're going to have bowel contents leaking into the abdomen. That's going to be visualized by this camera. That's what they're looking for. They don't see that. Why not? Because it's the middle, the umbilical trocar that causes the problem. Yes? I think it's already been established that there were cameras in the left and the right, correct? No. There's only the center camera. There's a left and right trocar that allow the passage of surgical instruments. The instruments go in. All visualization is done through the center umbilical trocar placement. That's where we start to... Is it an appropriate standard of care to insert a camera in one of the other trocars to check to see the condition of the center trocar and whether or not it caused any injury? If that were done, would a camera in the left or the right trocar viewing the umbilicus or umbilicus, however it's pronounced, indicate that they could have seen that there was a sextuple at perforation? That's an outstanding question. There is nothing in the record speaking to the standard of care requiring insertion of a camera in a left or right side trocar. So this is the plainest burden of proof to show a violation of the standard of care. They did not deduce any evidence. How long would it take to stick a camera in a trocar and look at the center to see if there was any injury upon entry? I don't know, but this is not my area of specialty. It's not my area of expertise. So I go by what's in the record. It's possible they still couldn't see it because, remember, we had testimony that the presence of that center trocar tamponaded the leakage of any contents so that you really couldn't tell the perforations were there. You would have to have removed that trocar and been looking from a left or right, but then you'd have the same problem. If the left one came out last and the injury was actually there and you no longer have the center one, then you wouldn't be able to detect leakage from that left side one. So it's an excellent question, but the evidence is silent. The record is silent as to that. So we could not use that as a basis for finding a violation of the standard of care. My question was more in the nature of if this is so common or that it can happen without negligence, then why is it a precautionary measure if this isn't considered one of the protocols to insert a camera in one of the other trocars to view the initial intrusion, either the OptiView is capable of determining these things or if it isn't, as you suggested, then maybe the protocol should be changed. That's entirely possible. Unfortunately, I can't change it from here, and the record is silent. So for the purposes of this case, that would not be determinative. But Judge Porciaska's ruling on the admissibility of this evidence, he found it admissible for two purposes as affirmative evidence of non-negligence because, again, Dr. Dine inserted an umbilical trocar. He perforated a compressed adhesed bowel and caused injury. And his explanation why that did not violate the standard of care was because it was distorted anatomy. We wouldn't have expected that the bowel would be adhesed in the manner it was stuck to the abdominal wall. How is, based upon his testimony, his incident impeaching when he says that this can be done without negligence? Well, he says that generally a bowel perforation can occur without negligence, but he says to perforate in this manner using an OptiView was negligence. When he said this manner, did he mention six perforations or did he just mention one? He said the sixth, and he said it was the volume of tissue, and that really is the heart of the case because that's what the jury was asking about. Dr. Dine opined that the six perforations, that if the bowel was adhesed, it would be six centimeters of tissue that the trocar actually went through. And the jury asked Dr. Schleicher to opine, do you agree with Dr. Dine? And Dr. Schleicher said, no, I do not. It would be one and a half to two centimeters. The bowel in a preoperative patient who's not consuming liquids or food is very thin and flat like a ribbon. It's not a big, fat garden hose, which is how Dr. Dine described it. Two centimeters is close to three-quarters of an inch. It is, but I believe that that's about what the tip of the trocar is as well. So, again, we have conflicting evidence between the defense expert and the plaintiff's experts as to how much tissue was involved. That makes it a question for the jury, which is what it was here. There was not an abuse of discretion in allowing the jury to hear all of this evidence and weigh all of the evidence. And even if you could find an abuse of discretion. Relative to referencing the injury caused by a plaintiff's expert, that for purposes of recognizing the injury, that Dr. Dine's prior injury is not relevant and material to the facts in this case. Well, an instruction of that nature could have been requested by the plaintiff, but it was not, so while that might have been a good way of handling this, it was not requested, so you cannot show error and certainly not an abuse of discretion by failing to give an instruction of that type since one was never tendered. And as difficult as the abuse of discretion standard is to meet, no reasonable court would have acted as the trial court did. Then you have to show that there was prejudice here, and the trial court found no prejudice. In ruling on the post-trial motion, the court reviewed all of the evidence, reviewed the expert testimony, reviewed the competing theories, reviewed how each side was able to question the other side's experts, including the plaintiff questioned one of our experts, Dr. Sobiski, about a prior bowel injury that he had. And so it was really a level playing field. Each side was able to put forth their theory of the case. Each side was able to attack and attempt to discredit the other side's theory of the case. The jury was very attentive, asked very insightful questions, and drew its own conclusions. I submit that on this record there's no abuse of discretion in admitting Dr. Dine's testimony, the evidence regarding his prior procedure, and that even if there was, you could not show prejudice here because of all of these avenues. He was able to explain all the differences. If the procedures were so different, then how could this be so damaging to his credibility? The jury would have said, well, the procedures are very different. If it was so damaging to ask about a prior bowel perforation, well, the plaintiff asked our expert, and our expert said, yes, I perforated a bowel. It was an adhesed bowel stuck to the abdominal wall. So there was testimony that this type of incident had happened on both sides. It was not just plaintiff's expert. Was there any evidence that, in this instance, the enfolded portion was stuck to the abdominal wall, or was it that only one segment of the bowel was adhesed or stuck, and the other two sections of the bowel were all low looped? They weren't connected to the semicolon? There is evidence that the bowel itself was adhesed, so the lower portion would not have been touching the wall. Here's the abdominal wall. The top part is stuck to that, and then as you come down, those loops are stuck to one another. They're no longer stuck to the wall. They're stuck to each other, and there is evidence in the medical record that Dr. Miller had to physically break up adhesions on the looped bowel in order to be able to run the bowel. They straighten it out like a garden hose like this, looking for the perforations. So there is evidence in the record that the bowel was stuck to itself. We don't have direct evidence in the record that it was stuck to the abdominal wall. That's a theory, just like plaintiff had the theory that it was the left trocar that caused the injury as the doctor was trying to maneuver around the omentum. There's no direct evidence of that either. We have competing theories that were presented to the jury, and the jury ruled for the defense, and we submit that there is no reversible error here. There's no abuse of discretion. Thank you. Thank you, Your Honors. Mr. Orsi? Are you a speed talker? I'm sorry? Are you a speed talker? You supposedly have two minutes. I have two minutes, and what I will say is Ms. Kollross covered each and every point that I wanted to based on the questions that you had, and I have no problem resting on the brief and turning the floor over unless you have any questions for me. I reserved the two minutes just in case there was something I saw that needed to be addressed that hadn't been. So I'm more than willing to answer any questions that you may have. If you know what was causing, I don't know what an adhesion is to the extent that I don't know whether it is fibrous, whether it is scar tissue, whether it is cellular amalgamation or fusion between cells of different organs. Can you tell me what an adhesion is? I think you're correct, and you're in the general ballpark. What I ask experts when I speak to them is speak to me in layman's terms so that I can understand them. I'm a lawyer, not a doctor, and I need to be able to explain that to a jury. The best way that it's been explained to me is that an adhesion is a period where an organ or a piece of tissue is stuck together, plain and simple, and there may be different reasons for that. Different reasons, because I've heard that scar tissue very often is an adhesion. It can be. I believe it can be. Is there anything in the record about how long it takes for two parts to adhese to one another? I don't believe there is. I don't recall offhand, but as I stand here, I don't believe that there is. Or anything in the record about whether or not the adhesion could have taken place actually just during that three-day interval between the first and the second surgery? I don't believe there was drug testimony about that. I believe actually there may have been. Well, was there any testimony as to whether or not? I'm trying to figure out how to explain it. There are six holes. Was there any evidence as to whether there were spaces between the second and the third and the fourth and the fifth holes? I believe the pathology report generally spoke to that. And because if there were adhesions and it was completely glued together, those holes should have just drained into the other part of the bowel. Do you see what I'm saying? Yeah, it depends, though, on. . . So that there are actually only two holes on the exterior and possibly only one. The one that was adhesive stuck to the stomach wall would supposedly leak into the bandaging, and the one, the last hole was the one that leaked into the body cavity. The way that evidence was presented is that there were three entries to the bowel, through and through. So that means that if you laid out the bowel, there was three entries, one, two, three. So if the bowel is like this, if you had three entries, one, two, three, but they were through and through. So that's how you have your six holes. The issue becomes is how. . . What I thought was the evidence that it was like this. . . And that the perforation went through, through, and through this way. That is exactly the defense's theory. Because, well, then the point is, if that's the case, then the only hole that would have leaked would have been the last hole, if this is true. Correct. And that was the defense's theory that if it would have been. . . Well, let me back up. The defense's theory was that when that initial trocar went through, just like you have illustrated, that the trocar itself doesn't leave. So you wouldn't expect to see enteric contents, and neither surgeon did. You wouldn't expect to see any injury, and neither surgeon did. Let's not forget that there was testimony. You can't turn that camera and look back up. Right? So the camera is down here, and we're looking into the cavity. A crucial piece of evidence here is that neither surgeon saw an injury. And remember, the camera, once it's inserted, they're looking to see the left trocar go in, to actually see it penetrate through and come into the cavity. So for you to believe the plaintiff's theory, you have to believe that two surgeons looking at screens via this camera completely missed where this trocar was going. The left trocar. The left trocar. You have to believe that under absolute direct visualization, there's no question about that, that they witnessed this trocar perforate the bowel three times through and through and did nothing about it. Completely missed it and completely ignored it. Completely. The reason why they never saw any enteric contents, and the reason why they never saw a sign of injury, is because it was the umbilical trocar. The trocar went through. It blocked all the enteric contents. They couldn't turn the camera and look back up. The bowel was so compressed and adhered to the abdominal wall that Dr. Schleicher never had a chance to see what he was going through. He hit the wall, boom, he's right through the bowel. And that makes perfect sense because neither physician saw any evidence of the injury. And it's also worth noting that Dr. Blumenthal, as a basis for his opinion, noted that there was enteric contents near the entry, the umbilical entry, where the bowel is. Right? There was a bowel stain, right? Yes, exactly. That would indicate that's where this injury took place. So, so. Go ahead. If I may just briefly. As a side note about this credibility issue, there's many reasons you could use the evidence for Dr. Dine, and I'm not going to go into that now. But that's just a piece of the puzzle. There are many pieces to this puzzle. Experts in medical malpractice cases look at the evidence, and they make inferences from the evidence, and they come up with their opinions. There was no error here. Plaintiff had a full, fair trial. Everybody put forth their evidence. Everybody went at it. Everybody's an expert. And there's no use of discretion here. The verdict should stand. Thank you. I have one last question. You keep talking about the initial insertion, which is the one holding the camera. That has a camera on it from the beginning. It's not inserted and then you put the camera in. The camera's with you the whole time. Why didn't the doctor see that he was going through way too many layers of tissue? That's the whole point. He doesn't know why he didn't see it. There had to be a reason why he didn't see it.  on the umbilical insertion allows full visualization. No, it lets you see exactly what's in front of the camera, which is the six layers of tissue. You can see everything. And that's full visualization. It has no limitations to it. Well, that's not necessarily accurate. We're talking about in the initial incision. Right. It goes through the skin and then through the six layers of bowel. Why doesn't he see that he's gone through six layers of bowel? And if we were to believe the medical report, arguably two to three to four layers of adhesion. Well, our defense expert opinions is that that bowel was so compressed and so tightly compressed that it was very, very small. Big or small, if you have a camera, it's in front of you. Why didn't he see it? Because of the time that it took to go through it. He put it in too fast? Boom. And you're through it. And you're through it before you had an attempt to visualize it. Remember, Dr. Schleicher doesn't know why he didn't see it. There had to be a reason why he didn't see it. And that's all part of the defense's purpose. Real quick question. What is the difference between the OptiView and the laparoscopic camera, their capabilities? What is the difference? Is there testimony in the record about that? When you talk about a laparoscopic camera, are you talking about the one that's inserted second and remains in there for the procedure? I'm not sure that there is a difference that I recall. Okay. I don't know if there is either, but I don't know why there would be a change if there was no difference. And I would suggest to you the difference is that one can be moved around and pointed in different directions, whereas the initial one is on the tip and is stationary and, as you said more than once, points straight forward. That's just surmise. I'll probably go online and look it up. Of course you will. Yes. Okay. Thank you. Thank you very much. Can you answer that for me? The camera is the same. What happens is it's initially on the tip. It's inserted. The trocar is removed through a stylus. The camera then remains in the abdomen and can be moved. It gives a description. But the camera, the initial camera that's inserted is the same. The trocar is removed? The initial trocar is put in through a stylus, and then it's removed and it's used in the other ports. And the question was asked here, how did the defendant not see this? How did he not see this? Well, the reason he didn't see it is in his operative report. He says the area around the left port was obscured by the omentum. He said he couldn't see it as he was going in. And the reason he didn't see leakage is the same reason that the defendants are saying you didn't see leakage by the umbilicus. It's tamponaded, number one, and secondly, the bowels are empty. There's a very slow leak. The fact that he finds a stain at the umbilicus after the fact is irrelevant because at that point her whole intra-abdominal cavity is stained with fluid and toxic. So he pointed to one area of the abdomen and said, well, I see a stain there. Well, her whole abdomen is loaded with fluid. And I want to correct the misstatement that was attributed to me. I absolutely, in response to Judge Spence's question, say that there were adhesions noted on the second exam, on the second operation, pardon me. There were adhesions, and I said that before. The adhesions were the bowel was adhesed together, and they had to go through and remove the bowel together. And part of what occurred in those intervening days when the peritoneal infection was taking place was they caused inflammation and adhesions. So during the course of the second procedure, the bowel was noted to be adhesed. There was no notation of a compressed bowel adhesed at the area where they say the injury occurred. That's the distinction. There were adhesions throughout her abdomen. She had prior abdominal surgery. Her abdomen was loaded with adhesions, which is why they used a camera in the first place. And the testimony was absolutely you had to do this under direct visualization because you could anticipate the presence of adhesions. Now, again, with respect to this width of bowel, at pathology, the damaged bowel was inspected. And by the way, the holes were within a certain number of centimeters, but the three holes, which didn't necessarily mean that the bowel was in this compressed S shape that the defendants postulated. But most importantly, when the bowel was taken to pathology is when it was measured as being 3.5 centimeters in diameter. It was not compressed. It was not compressed, according to the pathologist. What did they say in response to that? Because how could they then support their theory that there was this compressed adhesed bowel? They said, well, the pathologist must have insufflated it, or when it was placed in liquid, maybe it puffed up again. That's absolute speculation. Was it like this, possibly? I believe it was 3.5 centimeters in diameter. So that is where Dr. Dine came up with, not came up with, that's the basis. What do you mean by diameter? The diameter of the bowel. Of the circle? Of the loop? Of the loop. The loop that had been removed. Well, then if it's 3.5, then it's pi D, and 3 times 3.5 is about 11 or 12 centimeters, we're talking. No, no, no, no. It was about three-quarters of an inch, whatever that amounts to, in diameter. But it was gone through three times, according to their theory. Yes, but if there are three thicknesses of bowel, and the diameter of the looping is three inches, the diameter is this way, the horizontal is two radii. If you figure out what the circumference of the circle is, or the loop, it's pi D. And that means that when you take this out, it's five inches long, or six inches, or if it's three-something, then it's 11 or 12 inches, or whatever. Do you see my point or not? I don't, because I'm just talking about the pathology measuring the piece of bowel that he got, the diameter of the portion of the bowel that had been resected. It wasn't opened up. It was a portion of a bowel a certain centimeter in length that had been resected, and he measured the diameter. And the diameter, whatever the measurement was, is not really relevant. It didn't show that it was compressed tight, that the two sides of the bowel were pushed together, is my point. Their whole theory was that the bowel was all pushed together and stuck to her abdomen. It was not. It had a space. It was open. And that is what Dr. Dine based his opinion on, on how would you go through this length of bowel without seeing it. Dr. Schleicher, I'm sure, did, and I think I read this somewhere, did an operative report. Is that right? Correct. And that was, when did he draft that operative report? The operative report, I believe, was dictated on the day of the procedure. I don't, I'm not sure. So it would have been before the second surgery, correct? It would have been before the second surgery, to my recollection. Was there any reference in that operative report as to any difficulty in inserting the left trocar? Other than the omentum obscuring certain areas, there was not. There was mention of difficulty inserting the initial trocar, where he talked about not having an instrument of adequate length. And so your theory then, the plaintiff's theory, is that through that left trocar he perforated the bowel three separate times, three separate places, right? Full width. Full width. Full width. Without seeing it on the cameras where they're watching. Correct. And the alternative theory was, if this did happen at the umbilicus, he's just as negligent because now he's going through, according to their theory, he's going through three layers of bowel that are all together in an S shape, as His Honor is demonstrating. So you have the bowel is like this, and here, so now he's going through this whole length. And not only is the feel different, but we had a demonstration that the colors, as you're going through the different layers of the abdomen, the outer layer of the bowel, the inner layer of the bowel, it's all different colors and shapes. When you say demonstration, was that before the jury? We had boards taken from a YouTube video that shows what you see as you're entering. For the jury to see. For the jury to see. And this was a color camera. This was a color camera. Any other questions? No. Thank you. We'll take a case under advisement. There are other cases on the call. We'll take a short recess.